1

2

3

4

5

6

7    **UNITED STATES DISTRICT COURT**

8    **NORTHERN DISTRICT OF CALIFORNIA**

9    **SAN FRANCISCO DIVISION**

10

| | |
|---|---|
| JBR, INC., a California corporation, doing business as ROGERS FAMILY COMPANY, | Case No. 12-cv-02377 NC |
| Plaintiff, | **ORDER FOR REASSIGNMENT WITH REPORT AND RECOMMENDATION TO GRANT MOTION FOR DEFAULT JUDGMENT IN PART, DENY IN PART** |
| v. | |
| CAFÉ DON PACO, INC.; ALVARO MONTEALGRE, aka ALVARO E. MONTEALEGRE RIVAS; ROBERTO BENDAÑA, aka ROBERTO BENDAÑA McEWAN, | Re: Dkt. No. 40 |
| Defendants. | |

19      Plaintiff JBR, Inc. moves for default judgment in this coffee contract dispute.

20  Plaintiff alleges that defendants Café Don Paco, Inc., Alvaro Montealegre, and Roberto

21  Bendaña failed to perform as contracted for the sale of coffee, and tortiously interfered

22  with plaintiff's relationship with coffee farmers.  Because the defendants have not

23  consented to the jurisdiction of a magistrate judge, the Court refers this case for

24  reassignment to a district court judge.  The Court recommends that plaintiff's motion for

25  default judgment be granted as to plaintiff's claims for breach of contract and common

26  counts, but that the motion be denied as to plaintiff's claim for intentional interference with

27  an economic relationship.  The Court recommends that judgment be entered in plaintiff's

28  favor in the amount of $320,809.97 plus $75,876.50 in attorney's fees and costs.

# I. BACKGROUND

## A.    The Parties

Plaintiff JBR is a California corporation, doing business as Rogers Family Company ("JBR"), which provides community aid for sustainable coffee farming to its coffee suppliers.  Dkt. No. 64 at ¶¶ 1, 9.

Defendant Café Don Paco, Inc. ("CDP") is a Texas corporation operating in San Antonio, Texas.  CDP was formed in 2004 by defendant Alvaro Montealegre ("Montealegre") and Lily Maria Bendaña McEwan ("McEwan").  McEwan is Montealegre's wife and the sister of defendant Roberto Bendaña ("Bendaña").  Dkt. No. 41-1 at ¶ 10.  CDP imports and distributes coffee from a company in Nicaragua called Café Don Paco, S.A. ("S.A.").  Dkt. No. 64 at ¶ 3.  S.A. was jointly owned by Montealegre and Bendaña until December 2011, when Bendaña purchased Montealegre's interest in the company.  Dkt. No. 41-1 at ¶ 20.

Bendaña is the son of S.A.'s founder, Francis Ernest Bendaña Radzevich ("Radzevich").  Bendaña facilitated coffee contracts between JBR, CDP, and S.A.  Dkt. No. 41-1 at ¶¶ 3, 15, 21.  Bendaña is a citizen of Texas.  Dkt. No. 64 at ¶¶ 3, 20.  Montealegre is the brother-in-law of Bendaña and is alleged to be the President of CDP.  Dkt. No. 64 at ¶¶ 13, 32.  Montealegre is a citizen of Nicaragua.  Id. at ¶ 4.

## B.    Alleged Facts

JBR formed a business relationship with Bendaña, Radzevich, and Montealegre in 1997, and JBR's president, Jon Rogers, maintained a close relationship with Radzevich.  Id. ¶ 9-11.  Since 1997, JBR has given over $500,000 in aid to S.A.'s community for children's nutrition programs, health clinics, housing, schools, and hiring teachers.  Id. at ¶ 11.

JBR and CDP had an ongoing arrangement under which JBR bought green coffee from coffee farmers in Nicaragua with whom CDP had a relationship.  Id. at ¶ 20. On October 14, 2008, JBR entered into a written agreement with CDP to lend CDP $350,000, which was repaid in green coffee beginning in March 2009.  Id. at ¶ 13; Dkt. No. 41-1 at ¶ 12.  In December 2010 and January 2011, Bendaña requested two additional loans

of $200,000 related to the 2010-11 growing season.  Dkt. No. 64 at ¶¶ 14-18.  A promissory note secured the first $200,000 and set the terms for repayment.  *Id.*  JBR wired $200,000 to CDP's account at Sterling Bank in San Antonio, Texas, on December 13, 2010.  *Id.* at ¶ 16. In January 2011, JBR loaned CDP another $200,000 at Bendaña's request, which was also memorialized with a promissory note and wired to CDP's account at Sterling Bank in San Antonio, Texas, on January 5, 2011.  *Id.* at ¶¶ 16-18.  As of January, 2012, CDP had not repaid JBR in green coffee or fully repaid the December 2010 and January 2011 loans.  *Id.* at ¶ 28.

Plaintiff further alleges that following defendants' failure to repay the loan in green coffee, defendants made false statements to farmers in Nicaragua, with whom plaintiff had a longstanding economic relationship, stating that it was plaintiff who had failed to pay its bills or purchase coffee.  *Id.* at ¶¶ 53, 54.  Plaintiff alleges that it suffered "loss of reputation and loss of business" as a result of defendants' false statements.  *Id.* at ¶ 58.

**C.    Procedural History**

JBR filed its complaint on May 10, 2012, against CDP, Bendaña, and Montealegre. Dkt. No. 1.  The complaint brings claims for breach of contract, common counts, and intentional interference with economic relationships.[1]  Dkt. No. 64.

On October 2, 2012, JBR attempted to serve the summons and complaint on CDP, Bendaña, and Montealegre.  *See* Dkt. Nos. 11-14.  A process server mailed copies addressed to the company, Bendaña, and Montealegre at the company's registered address, 415 Embassy Oaks Drive, Suite 100, San Antonio, Texas.  *Id.*  The process server also served a copy of the complaint and summons on the manager of Q Pharmacies, which operates at 415 Embassy Oaks Drive.  Dkt. No. 14.  In addition, he delivered a copy to the Texas Secretary of State.  *Id.*  On October 9, 2012, the Texas Secretary of State mailed a copy of the summons and complaint to CDP by certified mail.  Dkt. No. 15.  As of March 11, 2013, CDP does not have a physical office in San Antonio, Texas.  Dkt. No. 24-1 at ¶ 10, Ex. F.

---

[1] At the hearing on the motion for default judgment, JBR voluntarily dismissed its fraud claims. Dkt. No. 53.

1   Bendaña does not have an identifiable address in Texas.  Dkt. No. 6.  On June 9,

2   2012, JBR emailed Bendaña the summons, complaint, and initial case management

3   schedule at the email address Bendaña used to communicate with JBR.  Dkt. No. 24-1 at ¶

4   5.

5   JBR served a copy of the summons and original complaint at a Texas residence

6   owned by Montealegre and his wife, but the home had been sold.  Dkt. No. 6.  On June 12,

7   2012, JBR contacted the Almori Foundation, one of Montealegre's publicly listed

8   organizations, and spoke with Maria Barrantes.  Dkt. No. 24-1 at ¶¶ 2, 5, 6.  Barrantes

9   confirmed that Montealegre was on site and that she would personally deliver the complaint

10   and summons to him.  *Id.* at ¶ 5.  JBR emailed Barrantes the complaint and summons.  *Id.*

11   Bendaña responded to the June 9 email on October 23, 2012, and stated that he had

12   "never been an employee nor partner of Café Don Paco Inc.," but is a partner in the

13   Nicaraguan company, and that Montealegre is the owner of CDP.  *Id.*  Bendaña provided

14   JBR with the email addresses of Montealegre and his legal adviser, Mauricio Gomez, and

15   copied them on his response.  *Id.*  On October 24, 2012, JBR again emailed the summons

16   and complaint to the email addresses that Bendaña had responded from.  *Id.* at 15.  JBR also

17   emailed the complaint and summons to Montealegre and his legal advisor at the addresses

18   provided by Bendaña.  *Id.*  No emails sent to Bendaña or Montealegre have been returned as

19   invalid or undeliverable.  *Id.* at ¶ 11.

20   On October 30, 2012, this Court ordered JBR to complete service and file for default.

21   Dkt. No. 10.  JBR requested entry of default on January 1, 2013 and again on February 27,

22   2013.  Dkt. Nos. 17, 21.  The clerk denied both requests for failure to serve defendants.

23   Dkt. Nos. 19, 26.  JBR then requested that this Court authorize service by email and extend

24   the period of time for service.  Dkt. Nos. 24, 25, 27.  The Court granted JBR's motions for

25   alternative service and extension of time.  Dkt. No. 28.  The Court found that CDP was

26   properly served under Texas law, and defective service as to Bendaña was permissible, as

27   he had actual notice of the suit.  *Id.*  The Court ordered JBR to serve Montealegre by email

28   by May 10, 2013, which JBR did.  Dkt. Nos. 28, 29.

JBR then moved for entry of default for all defendants.  Dkt. No. 30.  On July 11, 2013, the Clerk entered default as to all defendants.  Dkt. No. 31.  JBR then submitted this application to the Court for default judgment against defendants CDP and Montealegre on the grounds that they are in default and have not appeared in this action to date, and against defendant Bendaña on the grounds that he has failed to defend.  Dkt. No. 40.  On January 8, 2014, the Court heard oral argument regarding JBR's motion for default judgment.  Dkt. No. 53.

The Court then ordered JBR to show cause why the action should not be dismissed for lack of diversity jurisdiction, because JBR had alleged that defendant Montealegre was "a resident of Texas" which is insufficient to establish the diverse citizenship of the defendant.  Dkt. No. 56.  JBR responded by requesting leave to amend the complaint in order to cure the pleading defect and allege the citizenship of Montealegre.  Dkt. No. 57.  The Court granted leave to amend the complaint, and found that service of the amended complaint on defendants was not necessary, because the amended complaint would allege new facts but not new claims.  Dkt. No. 58 (citing Fed. R. Civ. P. 5(a)(2) ("No service is required on a party who is in default for failing to appear.  But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4.")).

JBR amended its complaint on July 17, 2014, alleging that Montealegre is a citizen of Nicaragua.  Dkt. No. 59 at ¶ 4.  The Court again ordered plaintiff to show cause why the action should not be dismissed for lack of subject matter jurisdiction, because plaintiff failed to allege that Montealegre was diverse at the time of initiating the lawsuit, rather than at the time of amending the complaint.  Dkt. No. 60.  Plaintiff responded by requesting leave to amend again, Dkt. No. 62, which the Court granted.  Dkt. No. 63.  JBR filed its second amended complaint on August 18, 2014, alleging that Montealegre "is, and was at all times mentioned herein, including the date of filing this complaint in May 2012, a citizen of Nicaragua."  Dkt. No. 64 at ¶ 4.

//

//

## II. LEGAL STANDARD

A default may be entered against a party who fails to plead or otherwise defend an action and against whom a judgment for affirmative relief is sought. Fed. R. Civ. P. 55(a). After entry of default, a court has discretion to grant default judgment on the merits of the case. Fed. R. Civ. P. 55(b); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Federal Rule of Civil Procedure 55(b)(2) provides that a party must apply to the Court for default judgment. "If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing." Fed. R. Civ. P. 55(b)(2). "No party in default is entitled to 55(b)(2) notice unless he has 'appeared' in the action." *Wilson v. Moore & Assocs., Inc.*, 564 F.2d 366, 368 (9th Cir. 1977).

At the default judgment stage, the factual allegations of the complaint, except those concerning damages, "together with other competent evidence submitted" is deemed admitted by the non-responding parties. *Shanghai Automation Instrument Co., Ltd. v. Kuei*, 194 F. Supp. 2d 995, 1000 (N.D. Cal. 2001); *see also Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). "However, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (quotation marks omitted)). Therefore, "*necessary* facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)) (emphasis added); *accord DIRECTV*, 503 F.3d at 854. Failure to allege a valid claim against the defendant is not cured by evidence presented at the default hearing. *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1393 (9th Cir. 1988).

In deciding whether to grant default judgment, the Court may then consider the following factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at

stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

### III. DISCUSSION

**A.    Jurisdiction**

In considering whether to enter a default judgment, a district court first must determine whether it has jurisdiction over the subject matter and the parties. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  "[T]he district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (considering subject matter jurisdiction on a 12(b)(1) motion).

**1.    Subject Matter Jurisdiction**

The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(3), which gives federal district courts "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States and in which citizens or subjects of a foreign state are additional parties."

JBR claims $281,594.93 in damages plus interest, $500,000 in consequential damages, attorneys' fees, and costs under each of its substantive claims.  Dkt. No. 64 at 12-13.  Thus the amount in controversy requirement is met.

JBR is a California corporation with its principal place of business in California.  *Id.* at ¶ 1.  CDP is a corporation "incorporated under the laws of the State of Texas, having its principal place of business in the State of Texas."  Dkt. No. 64 at ¶ 2.  For purposes of diversity, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business. . . ."  28 U.S.C. § 1332(c)(1).  Thus, CDP is a citizen of the State of Texas and is diverse from JBR.

The complaint alleges that defendant Bendaña is "an individual" who "is and was at all times mentioned herein a citizen of the State of Texas." *Id.* at ¶ 3. Bendaña does not dispute his citizenship in his declaration in support of the default judgment. *See* Dkt. No. 41-1. Thus, Bendaña is a citizen of the State of Texas and is diverse from JBR.

In the second amended complaint, JBR alleges that Montealegre "is, and was at all times mentioned herein, including the date of filing this complaint in May 2012, a citizen of Nicaragua." Dkt. No. 64 at ¶ 4. Thus Montealegre is a citizen of a foreign state and is an additional party that is diverse from JBR. *See Brady v. Brown*, 51 F.3d 810, 815 (9th Cir. 1995) (noting that § 1332(a)(3) "confers jurisdiction when a citizen of one state sues both aliens and citizens of other states.").

Because all defendants are diverse from plaintiff and the amount in controversy requirement is satisfied, the Court finds that it has diversity jurisdiction.

### 2.   Personal Jurisdiction

"Without a proper basis for [personal] jurisdiction, or in the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." *S.E.C. v. Ross*, 504 F.3d 1130, 1138-39 (9th Cir. 2007).

### a.   Basis for Personal Jurisdiction

To enter default judgment, the Court must have a basis for the exercise of personal jurisdiction over the defendants in default. *Tuli*, 172 F.3d at 712; *see also King v. Russell*, 963 F.2d 1301, 1306 (9th Cir. 1992). Traditional bases for conferring a court with personal jurisdiction include a defendant's consent to jurisdiction, personal service of the defendant within the forum state, or a defendant's citizenship or domicile in the forum state. *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2787 (2011). Absent one of the traditional bases for jurisdiction, the Due Process Clause requires that the defendant have "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (citations and internal quotation marks omitted).

In determining whether the exercise of personal jurisdiction over a nonresident defendant is proper, a district court must apply the law of the state in which it sits where, as here, there is no applicable federal statute governing personal jurisdiction. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). District courts in California may exercise personal jurisdiction over a nonresident defendant to the extent permitted by the Due Process Clause of the Constitution. Cal. Code. Civ. P. § 410.10.

The party seeking to invoke jurisdiction has the burden of establishing that jurisdiction is proper. *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1392 (9th Cir. 1984). That party need only make a prima facie showing of jurisdictional facts when the court does not conduct an evidentiary hearing regarding personal jurisdiction. *Fiore v. Walden*, 657 F.3d 838, 846 (9th Cir. 2011) (citation omitted). However, "mere 'bare bones' assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden." *Fiore*, 657 F.3d at 846-47 (citation omitted). "[L]itigation against an alien defendant requires a higher jurisdictional barrier than litigation against a citizen from a sister state." *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 588 (9th Cir. 1993) (citation omitted).

Personal jurisdiction may be founded on either general jurisdiction or specific jurisdiction.

### i.    General Jurisdiction

General jurisdiction exists when a nonresident defendant is domiciled in the forum state or his activities in the forum are "substantial" or "continuous and systematic." *Panavision*, 141 F.3d at 1320 (internal quotation marks omitted). To determine whether a nonresident defendant's contacts are sufficiently substantial or continuous and systematic, a court must consider their "longevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1224 (9th Cir. 2011) (citations and internal quotation marks omitted).

Here, JBR does not contend that the Court has general jurisdiction over defendants and alleges no facts to establish that the defendants' contacts with California are substantial or continuous and systematic.  Therefore, the exercise of general personal jurisdiction over defendants is unjustified.

### ii.     Specific Jurisdiction

When the nonresident defendant's contacts with the forum are insufficiently pervasive to subject him to general personal jurisdiction, the court must ask whether the "nature and quality" of his contacts are sufficient to exercise specific personal jurisdiction over him.  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977).  A court may exercise specific personal jurisdiction over a nonresident defendant if (1) the nonresident defendant purposefully directs his activities at the forum or performs some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the plaintiff's claim arises out of the forum-related activities of the nonresident defendant; and (3) the exercise of jurisdiction over the nonresident defendant is reasonable.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  The plaintiff bears the burden of satisfying the first two of these three elements; if the plaintiff fails to establish either of them, specific personal jurisdiction over the nonresident defendant is improper.  *Id.* (citations omitted).  If the plaintiff satisfies the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable.  *Id.* (citations and internal quotation marks omitted).

The first prong of the specific jurisdiction test is satisfied by either "purposeful availment" or "purposeful direction" by the defendant.  *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010); *see also Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (noting that the first step "may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof.").  "A purposeful availment analysis is most often used in suits sounding in contract.  A purposeful

direction analysis, on the other hand, is most often used in suits sounding in tort." *Schwarzenegger*, 374 F.3d at 802 (internal citations omitted).

Under a purposeful availment analysis, "[a] showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id.* "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. . . ." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks and citations omitted). When the exercise of personal jurisdiction over a defendant is based on the execution or performance of a contract, the court must "use a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.* at 479 (internal quotation marks and citation omitted). Accordingly, to determine whether the purposeful availment requirement is met, the court must look to the contract's "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing. . . ." *Id.*

Alternatively, a plaintiff can satisfy the first prong by showing that the defendant purposefully directed his activities at the forum. The Court evaluates purposeful direction by using the three-part effects test set out in *Calder v. Jones*, 465 U.S. 783 (1984), which requires that the defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 805 (internal quotation marks and citation omitted).

The Court analyzes whether plaintiffs have demonstrated that all three elements of specific jurisdiction are met for each defendant separately.

### A.   Café Don Paco

Turning to CDP's minimum contacts, the purposeful availment requirement is met for JBR's breach of contract claim. In 2008, JBR entered into a written agreement with

CDP to lend it $350,000, which was repaid.  Dkt. No. 64 at ¶ 13.  In December 2010 and January 2011, CDP entered into two more loans agreements for $200,000 from JBR.  *Id.* at ¶¶ 14-18.  All money was wired to CDP's account at Sterling Bank in San Antonio, Texas. *Id.* at ¶ 16.  The mere signing of a contract with an out-of-state party does not confer personal jurisdiction.  *Burger King*, 471 U.S. at 478-79.  However, each note was "made in accordance with and shall be construed under the laws of the State of California, U.S." and was payable to an address in San Leandro or Lincoln, California.  *Id.* at ¶¶ 13, 15, 18. "Although a governing law provision standing alone is not sufficient to confer jurisdiction, the Supreme Court has ruled that a choice-of-law provision should [not] be ignored in considering whether a defendant has purposefully invoked the benefits and protections of a State's laws for jurisdictional purposes."  *Advideo, Inc. v. Kimel Broad. Grp., Inc.*, 727 F. Supp. 1337, 1340-41 (N.D. Cal. 1989) (quoting *Burger King*, 471 U.S. at 482) (internal quotation marks omitted).  In addition, each note sought repayment in the form of shipments of coffee from CDP to JBR in California.  *Id.* at ¶ 19.  Given this arrangement, CDP "created 'continuing obligations' between himself and residents of the forum" by agreeing to repay the loans in the form of shipments of coffee to California.  *Burger King*, 471 U.S. at 476.

CDP availed itself of the privilege of conducting business in this forum.  Although Bendaña negotiated and signed these contracts, he was doing so on behalf of CDP, the money was wired to CDP's account, and CDP was the party obligated under the loan agreements.  Negotiating three loan agreements with a California corporation, having continuing obligations to make payments on these loans in the form of coffee shipments to California, and the choice of law provision are sufficient to show that CDP purposefully availed itself of the privilege of conducting activities in California.

The purposeful direction requirement is also met for JBR's intentional interference with economic relationships claim.  Taking the allegations in the complaint as true, CDP committed an intentional act by falsely representing to coffee farms, farmers, and others in Nicaragua—who CDP knew JBR was doing business with—that JBR was not paying its

bills, had delayed payments, and was not buying coffee.  Dkt. No. 41-1 at ¶¶ 53-54.  Given

that CDP knew that JBR was located in California, CDP expressly aimed these actions at

California and knew that any harm was likely to be suffered there.  *See id.* at ¶¶ 55-56.

These contacts support personal jurisdiction over CDP in California.  *See Excel Plas, Inc. v.

Sigmax Co., Ltd.*, No. 07-cv-00578 IEG (JMA), 2007 WL 2853932, at *6 (S.D. Cal. Sept.

27, 2007) (finding purposeful direction test met for intentional interference claim where

defendant's communications with plaintiff's customers were aimed at harming plaintiff's

contractual relationships in the forum).

JBR's claims arise out of the forum-related activities of the nonresident defendant,

CDP.  *See McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (holding that "the Due

Process Clause did not preclude the California court from entering a judgment binding on

[the defendant]" because "the suit was based on a contract which had substantial connection

with that State").  As of January 2012, CDP had not fully repaid JBR in green coffee or

cash, giving rise to this breach of contract claim.  Dkt. No. 64 at ¶¶ 27-28.  JBR's

intentional interference with economic relationships claim also arises out of CDP's forum-

related contacts with JBR.  Given the nature of the relationship between JBR and CDP, the

Court finds that personal jurisdiction over CDP in California is reasonable.

### B.    Bendaña

Bendaña has denied ever being an employee or partner of CDP, but he also stated that

he "facilitated all the contracts since 1997 working side by side with Pete [Rogers].  We

were one family, one Café Don Paco to the world until I left in December 2011."  Dkt. 41-1

at ¶ 21.  If Bendaña was an employee, the mere fact that CDP is subject to this Court's

jurisdiction does not necessarily mean that its nonresident officers, directors, employees,

and agents are subject to this Court's jurisdiction as well.  *See Calder*, 465 U.S. at 790.  On

the other hand, an employee who is subject to jurisdiction is not immune because he was

acting on behalf of his employer.  *See Davis v. Metro Prods., Inc.*, 885 F.2d 515, 521 (9th

Cir. 1989).  Thus, regardless of whether Bendaña was an employee, the Court considers his

1  contacts with the forum separately from CDP.[2]  *See Calder*, 465 U.S. at 789-90 (holding

2  that the court must assess individually each defendant's contacts with the forum state).

3      Bendaña facilitated coffee contracts between JBR, S.A., and CDP from 1997 to 2011.

4  Dkt. No. 41-1 at ¶ 21.  Bendaña also facilitated three loans between JBR and CDP.  *Id.* at ¶¶

5  16-19.  In 2008, Bendaña contacted Rogers on behalf of CDP for the first loan.  *Id.* at ¶ 13.

6  JBR and CDP entered into a written agreement, signed by Bendaña as Vice President of

7  CDP, in which JBR would lend CDP $350,000.  *Id.*  This loan was repaid.  *See id.*  In

8  December 2010 and January 2011, Bendaña signed two promissory notes for two loans of

9  $200,000 from JBR.  Dkt. Nos. 1 at ¶¶ 14-18; 41-1 at ¶¶ 17-19.  JBR and Bendaña

10  discussed the consequences of a failure to repay the loans.  Dkt. No. 64 at ¶ 24.

11      Bendaña availed himself of the privilege of conducting business in California by

12  facilitating coffee contracts with JBR for over ten years.  Bendaña negotiated three loan

13  contracts with JBR on behalf of CDP, each of which had a California choice of law

14  provision and were to be repaid in coffee delivered to California.  These allegations are

15  sufficient to show Bendaña's purposeful availment.

16      But the purposeful direction requirement is not met for JBR's intentional interference

17  with economic relationships claim as to Bendaña.  Bendaña attests that "Montealegre

18  controlled the payment of monies to the farmers. . . .  The Rogers Family had promptly paid

19  the money for the farmers, but Alvaro delayed payment causing great suffering and shifting

20  the blame to others."  Dkt. 41-1 at ¶ 22.  Bendaña's statements suggest that Montealegre

21  was the person falsely representing to coffee farms, farmers, and others in Nicaragua that

22  JBR was not paying its bills, had delayed payments, and was not buying coffee.  JBR has

23  not presented evidence to contradict Bendaña's testimony.

24      Even if purposeful direction is not satisfied as to JBR's tort claim against Bendaña,

25  however, the Court may exercise pendent personal jurisdiction over Bendaña for the

26  intentional interference claim.  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d

27
28  [2] At the hearing on its motion for default judgment, JBR stated that it is no longer arguing an alter
   ego theory of jurisdiction as to Bendaña.

1174, 1181 (9th Cir. 2004) (courts have discretion to exercise pendent personal jurisdiction over claims "in the same suit arising out of a common nucleus of operative facts."). The Court finds that both the contract and tort claims arise out of the same common nucleus of operative facts—defendants' failure to repay the loan in green coffee purchased from Nicaraguan farmers. *See CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004) (finding the "claims for tortious interference with contract and for breach of contract arise from a common nucleus of fact."); *NetApp, Inc. v. Nimble Storage, Inc.*, No. 13-cv-05058 LHK (HRL), 2014 WL 1903639, at *7 (N.D. Cal. May 12, 2014) (finding "both the contract-based claims and the tort-based claims are based on common factual predicates."). Because the Court finds it has personal jurisdiction over the breach of contract claim against Bendaña, the Court also exercises personal jurisdiction over the tort claim.

    As with CDP, JBR's claims arise out of the forum-related activities of the nonresident Bendaña. Although Bendaña has appeared, he has not argued that the exercise of jurisdiction over him would not be reasonable. Thus, the Court finds that personal jurisdiction over Bendaña in California is proper.

### C.    Montealegre

    Plaintiff argues that Montealegre is subject to personal jurisdiction because he is the alter ego of CDP. "[W]here a corporation is the alter ego of the stockholders so as to justify disregard of the corporate entity[,] jurisdiction over the corporation will support jurisdiction over the stockholders." *Flynt Distrib.*, 734 F.2d at 1393 (quoting *Sheard v. Sup. Ct.*, 40 Cal. App. 3d 207, 210 (1974)). Thus if JBR can establish that Montealegre is the alter ego of CDP, the Court can exercise personal jurisdiction over Montealegre based on the proper exercise of jurisdiction over CDP.

    To determine whether a shareholder is the alter ego of a corporate entity in a diversity action, federal courts apply the law of the corporation's forum state. *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993) (applying Montana law where plaintiff

corporation was incorporated in Montana).  Given that CDP is incorporated in Texas, the Court applies Texas law.

"Under Texas law, alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice."  *Bollore S.A. v. Imp. Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006) (internal citation and quotation marks omitted).  Factors that a court considers in determining whether the alter ego doctrine applies include: "the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes."  *Id.* In addition, "for the alter ego doctrine to apply against an individual under this test, the individual must own stock in the corporation."  *Id.*

Previously, this Court found that the facts alleged by JBR did not establish a prima facie case that warranted piercing the corporate veil.  Dkt. No. 28 at 6.  The Court noted that "JBR does not provide, and indeed may not know, what percentage of shares they own, how much control they exercise, and who else is involved in the management of the company." *Id.*  Subsequently, JBR has provided supplemental briefing and a declaration by Bendaña, which address these issues. *See* Dkt. No. 41-1, 54.

In his declaration, Bendaña asserts that McEwan asked their father for permission to use the name "Don Paco" to form an associated company in the United States, and that McEwan and Montealegre formed "Café Don Paco, Inc." in Texas, located at the same addresses as Montealegre's other businesses.  Dkt. No. 41-1 at ¶ 10.  Bendaña further asserts that Montealegre was the sole shareholder and "handled the financial aspect[s]" of, "controlled everything" in, and "had sole authority and judgment" for CDP.  *Id.* at ¶ 11-12. Bendaña contends that Montealegre controlled the payment of monies to the farmers and was the one who delayed the payments.  *Id.* at ¶ 22.  Bendaña also asserts that Montealegre was commingling CDP funds with his personal funds and investments and using CDP to

disguise money transfers. *Id.* at ¶ 12. Specifically, Bendaña states that he learned that Montealegre had used "$700,000 that came into Café Don Paco [(U.S.A.)] to ostensibly pay the debt of his own Panamanian company, International Investments and Financial Services, Inc. and Café Don Paco, S.A. [(Nicaragua)]." *Id.* Additionally, Bendaña states that Montealegre, without Bendaña's knowledge or consent, transferred a $400,000 obligation from Café Don Paco, S.A. (Nicaragua) to CDP in December 2009.[3]

JBR has now shown that Montealegre maintained full ownership interest in and complete control over CDP, did not follow corporate formalities by commingling his personal and corporate funds, and used CDP for personal purposes, such as paying off debts in his other companies. The Court finds that these facts warrant piercing the corporate veil of CDP as to Montealegre, and therefore, JBR has sufficiently shown that personal jurisdiction over Montealegre can be established through an alter ego theory of liability. Thus, CDP's minimum contacts are imputed onto Montealegre, and personal jurisdiction over him in California is reasonable.

### b.    Service of Process

Personal jurisdiction also requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "A federal court does not have jurisdiction over a defendant unless the defendant has been served properly under [Federal Rule of Civil Procedure 4]." *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988). The Court assesses separately whether each defendant was properly served.

Because the second amended complaint alleged new factual allegations but not new claims, the Court previously found that JBR could proceed with its motion for default judgment without serving the second amended complaint or restarting the process of moving for entry of default. Dkt. No. 58 (citing Fed. R. Civ. P. 5(a)(2) ("No service is

---

[3] Bendaña purchased Café Don Paco, S.A. (Nicaragua) in December 2011 without performing an audit. Dkt. No. 41-1 at ¶ 20.

required on a party who is in default for failing to appear. But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4."); *Bd. of Trs. of Laborers Health & Welfare Trust Fund for N. Cal. v. Perez*, No. 10-cv-02002 JSW (JCS), 2011 WL 6151506, at *5 (N.D. Cal. Nov. 7, 2011) (finding default judgment could be granted despite plaintiff not serving defaulting defendant with amended complaint, where amended complaint contained "new factual allegations" but not new claims)). The Court therefore evaluates the completion of service of the original complaint.

### i.  Café Don Paco

The Court found that CDP was properly served with a summons and complaint under Texas law. Dkt. No. 28. CDP has failed to plead or otherwise defend itself in this action and therefore a judgment may be entered against it. *See* Fed. R. Civ. P. 55(a). Given that CDP has not appeared in this action, it was not entitled to Rule 55(b)(2) notice of the motion for default judgment. *See Wilson*, 564 F.2d at 368. Thus, CDP has been properly served.

### ii.  Bendaña

The Court previously found that defective service as to Bendaña was permissible because he has actual notice of the suit, as JBR's counsel emailed him and Bendaña responded. Dkt. No. 28 at 10-11.

Further, the Court now finds that Bendaña has "appeared" in this action. "Normally, an appearance in an action involves some presentation or submission to the court." *Direct Mail Specialists*, 840 F.2d at 689 (internal quotation marks and citations omitted). Bendaña responded to JBR's counsel's email, requested that this Court grant him permission to use electronic case filing, and voluntarily executed a declaration in support of JBR's request for default judgment. Dkt. Nos. 34, 41-1.

Given that Bendaña has appeared, he is entitled to notice of the application for default judgment under Rule 55(b)(2). The Court finds that JBR properly served Bendaña with the notice of motion and motion for default judgment. Dkt. No. 45 at 4. Thus, Bendaña has been properly served.

### iii.  Montealegre

JBR demonstrated that it has made attempts to serve Montealegre at physical addresses that proved unsuitable for service.  *See* Dkt. Nos. 6; 11-14.  This Court authorized service upon Montealegre by email, finding that such service was reasonably calculated to give Montealegre notice of the suit and an opportunity to respond.  Dkt. No. 28 at 11.  The Court ordered JBR to serve Montealegre by email by May 10, 2013.  Dkt. No. 28.  On May 8, 2013, JBR served Montealegre the summons and complaint via email using various email addresses, including alvaro.montealegre@almori.com.  Dkt. No. 29 at 6.  On July 26, 2013, Montealegre sent an email to Pete Rogers from the same alvaro.montealegre@almori.com email address.  Dkt. No. 41 at 38-40.  JBR has therefore established that this email account has been an "effective means of communicating with the defendant[], which would serve the purposes of ensuring the defendant[] receive[s] adequate notice of this action and an opportunity to be heard."  *Williams-Sonoma Inc. v. Friendfinder Inc.*, No. 06-cv-06572 JSW, 2007 WL 1140639, at *2 (N.D. Cal. Apr. 17, 2007) (citing *Rio Props., Inc. v. Rio Int'l. Interlink*, 284 F.3d 1007, 1016-17 (9th Cir. 2002)).  Given that the alvaro.montealegre@almori.com email address appears to be a working email address for Montealegre, the Court finds that JBR properly served the summons and complaint on Montealegre and that he has actual notice of the lawsuit.  Dkt. No. 29.

The Court finds that this one email communication, however, does not constitute an "appearance" in the action by Montealegre.  "In limited situations, informal contacts between the parties have sufficed when the party in default has thereby demonstrated a clear purpose to defend the suit."  *Wilson*, 564 F.2d at 369.  In *Wilson*, the Ninth Circuit held that the party had not demonstrated a clear purpose to defend when the defendant sent two letters, one of which was "partially responsive to the allegations set forth in the complaint," to plaintiff's counsel, there were no settlement negotiations, and plaintiff's counsel warned the defendant to obtain counsel and file an answer to avoid default.  *Id.*  The court was "unwilling to hold that [the defendant's] 'informal contacts' constituted the equivalent of a formal court appearance" for Rule 55(b)(2) notice purposes.  *Id.*  Here, the only

communication from Montealegre was to Pete Rogers, which stated, "Thank you for taking

the call.  Please sen[d] me the number so I can figure out a way."  Dkt. No. 41 at 38.

Without more, the Court finds that this one email does not demonstrate a "clear purpose to

defend the suit."  Therefore, Rule 55(b)(2) notice of the application for default judgment

was not required.

### 3.    Magistrate Jurisdiction

JBR has consented to the jurisdiction of a United States magistrate judge under 28

U.S.C. § 636(c).  Dkt. No. 5.  Defendants never consented to the jurisdiction of a magistrate

judge and, therefore, this Court lacks the authority to rule on a motion that could dispose of

the case against them.  28 U.S.C. § 636(c); *Shanghai Automation Instrument*, 194 F. Supp.

2d at 999 ("Federal Rule of Civil Procedure 55(b)(2) permits the Court, following a

defendant's default, to enter a final judgment in a case.").  The Court therefore refers this

case to the clerk's office for reassignment to a district court judge.

### 4.    Venue

"[V]enue, like jurisdiction over the person, may be waived.  A defendant, properly

served with process by a court having subject matter jurisdiction, waives venue by failing

seasonably to assert it, or even simply by making default."  *Hoffman v. Blaski*, 363 U.S.

335, 343 (1960).  Thus, venue is a "privilege" that must be "seasonably asserted"—"at

latest before the expiration of the period allotted for entering a general appearance and

challenging the merits."  *Commercial Cas. Ins. Co. v. Consolidated Stone Co.*, 278 U.S.

177, 180-81 (1929) (internal quotation marks omitted).  "To hold that such a privilege may

be retained until after the suit has reached the stage for dealing with the merits and then be

asserted would be in our opinion subversive of orderly procedure and make for harmful

delay and confusion."  *Id.* at 181.

This Court determined that CDP has been properly served under Rules 4(h) and

4(e)(1) and that Bendaña has actual notice of the lawsuit.  Dkt. No. 28 at 5, 10-11.

Additionally, as previously discussed, this Court finds that JBR properly served

Montealegre and that he has actual notice of the lawsuit.  *See supra* Part II.A.2.b.iii.  Given

1  that all defendants have notice of the lawsuit, default was entered as to all defendants, and

2  they have failed to object to venue in the Northern District, venue has been waived.

3  **B.   Default Judgment**

4  The *Eitel* factors weigh in favor of granting default judgment against defendants as to

5  the breach of contract and common counts claims, but not for the intentional interference

6  claim. *See Eitel*, 782 F.2d at 1471-72.

7  **1.   Prejudice to Plaintiffs**

8  The first factor the Court considers is the possibility of prejudice to a plaintiff if

9  default judgment is not granted. *Eitel*, 782 F.2d at 1471.  If plaintiff would be without a

10  remedy if default judgment is denied, this factor weighs in favor of granting default

11  judgment. *See, e.g.*, *IO Grp., Inc. v. Jordon*, 708 F. Supp. 2d 989, 997 (N.D. Cal. 2010)

12  (finding that plaintiffs in copyright infringement action would be prejudiced because they

13  would be without recourse to stop defendant's infringement or to recover for the harm and

14  damages suffered).

15  Here, JBR has tried to resolve this matter in court for more than two years.  Dkt. No.

16  1.  If default judgment is not granted, JBR would have no other recourse to recover for the

17  harm defendants have caused them.  As such, JBR will suffer prejudice if default judgment

18  is not granted.  Therefore, this Court finds that this factor favors granting default judgment.

19  **2.   The Merits and Sufficiency of the Claim**

20  The second and third *Eitel* factors focus on the merits of plaintiff's substantive claims

21  and the sufficiency of the complaint. *Eitel*, 782 F.2d at 1471.  "Together, these factors

22  require that plaintiff assert claims upon which it may recover." *IO Grp.*, 708 F. Supp. 2d at

23  989 (citing *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 500 (C.D.

24  Cal. 2003)).  In this procedural posture, a court must take "the well-pleaded factual

25  allegations" in the complaint as true; however, the "defendant is not held to admit facts that

26  are not well-pleaded or to admit conclusions of law." *DIRECTV*, 503 F.3d at 854 (internal

27  quotation marks and citation omitted).  "[N]ecessary facts not contained in the pleadings,

28  and claims which are legally insufficient, are not established by default." *Cripps*, 980 F.2d

at 1267 (citation omitted).  JBR moves for default judgment on three claims against defendants: (1) breach of contract, (2) common counts, and (3) interference with economic relationship.  Dkt. No. 40-3.

First, the Court assesses choice of law and finds that California law must be applied to all three claims.  "A district court sitting in diversity generally must apply the choice of law rules for the state in which it sits."  *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 313 (9th Cir. 1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Under California conflict of law rules, contracting parties may agree to what law controls, "unless the choice is contrary to a fundamental interest of a state with a materially greater interest."  *Id.*  Here, the promissory notes state that the agreement is to be interpreted under California law.  Dkt. No. 41 at 24, 29.  The parties' choice of law is not contrary to the interests of another state considering that the payment was to be made in California and one of the parties was a citizen of California.  The Court therefore applies California law to the breach of contract claim.  Because the common count claim is derivative of the contract claim, the Court also applies California law to that claim.  *See McAfee v. Francis*, No. 11-cv-00821 LHK, 2011 WL 3293759, at *2 (N.D. Cal. Aug. 1, 2011) (common counts claims are derivative of contract claims).

The Court likewise applies California law to the tort claim.  In California, determining which forum's law applies to tort disputes requires "an analysis of the respective interests of the states involved (governmental interest approach) the objective of which is 'to determine the law that most appropriately applies to the issue involved.'"  *Hurtado v. Sup. Ct.*, 11 Cal. 3d 574, 579-80 (1974) (quoting *Reich v. Purcell*, 67 Cal.2d 551 (1967)).  Here, defendants' alleged tortious acts include making false statements to Nicaraguan farmers, with the intent to injure the plaintiff, which is a citizen of California.  On balance, the Court finds it reasonable to apply the law of California to the tort claim.  *See Consol. Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 391 (9th Cir. 1983) (finding district court appropriately applied California law to tort claim where "most

1  of the statements and events that gave rise to this case occurred in California, one party is a

2  resident of California, and California is the forum state.").

3                    **a.    Breach of Contract**

4        The elements of a breach of contract claim under California law are "the existence of

5  the contract, performance by the plaintiff or excuse for nonperformance, breach by the

6  defendant and damages." *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 745

7  (2001).

8        Here, plaintiff has alleged facts sufficient to establish a breach of contract against

9  defendants.  Plaintiff alleges that defendants breached an agreement to provide green coffee

10  in exchange for funds paid in advance.  Dkt. No. 64 at ¶¶ 15-29.  The terms of the contract

11  stated that plaintiff was to loan defendants a total of $400,000 in exchange for green coffee

12  to be delivered in multiple shipments beginning in January 2011.  *Id.* at ¶¶ 15, 18.  Plaintiff

13  alleges that it performed as required under the contract by wiring to CDP the $400,000 in

14  two payments sent in December 2010 and January 2011.  *Id.* at ¶¶ 16, 18.  According to the

15  complaint, defendants breached the contract by failing to deliver green coffee as promised

16  or to pay back the principal and interest on the loan after failing to cure the breach.  *Id.* at ¶

17  27.  Plaintiff alleges that defendants had actual knowledge "that Plaintiff JBR could and

18  would suffer losses of approximately $1,000,000.00 USD in the event defendants did not

19  perform because, at least in part, Plaintiff would be forced to obtain green coffee on the

20  open market at spot prices, or, alternatively, be unable to fill pre-existing or projected orders

21  based upon the contracts with Don Paco."  *Id.* at ¶ 25.  Accepting all factual allegations as

22  true, plaintiff has adequately demonstrated a substantial likelihood of success on the merits

23  of its breach of contract claim.

24                    **b.    Common Counts**

25        The elements of a claim for common counts "are (1) a statement of indebtedness of a

26  certain sum, (2) the consideration made by the plaintiff, and (3) nonpayment of the debt."

27  *First Interstate Bank v. State of California*, 197 Cal. App. 3d 627, 635 (1987).  The Court

28  finds that the same factual allegations that support plaintiff's breach of contract claim,

accepted as true, also support a common counts claim in the alternative.  *See Bank of the W.*
*v. RMA Lumber Inc.*, No. 07-cv-06469 JSW, 2008 WL 2474650, at *4 (N.D. Cal. June 17,
2008) (finding allegations that established a breach of contract claim also established a
claim for money due).  Thus plaintiff has established a likelihood of success on the merits
on the common counts claim.

### c.    Interference with Economic Relationship

The complaint does not make clear whether plaintiff brings an action for interference
with an existing contract or interference with a prospective economic relationship.  The
complaint alleges that defendants "had actual knowledge that plaintiff was in economic
relationships with coffee farms, farmers and others in Nicaragua, including, but not limited
to, Los Paples, La Florida and Ucasumann."  Dkt. No. 64 at ¶ 53.  The complaint further
alleges that defendants made knowingly false statements to those farms about plaintiff,
including that "plaintiff (1) had not paid its bills, (2) delayed payments, and (3) was not
buying coffee."  *Id.* at ¶ 54.  Plaintiff alleges that as a result of these false statements,
"plaintiff has been damaged by loss of reputation and loss of business in an amount yet
undetermined."  *Id.* at ¶ 58.

In California, the tort of intentional interference with contract requires "allegations of
the following elements: (1) a valid contract between plaintiff and a third party; (2)
defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a
breach or disruption of the contractual relationship; (4) actual breach or disruption of the
contractual relationship; and (5) resulting damage."  *CRST Van Expedited, Inc. v. Werner*
*Enters., Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007) (quoting *Quelimane Co. v. Stewart Title*
*Guar. Co.*, 19 Cal. 4th 26, 55 (1998)).  The tort of interference with a prospective economic
relationship differs in that plaintiff must show defendant interfered with a future economic
relationship rather than a binding contract.  *S.F. Design Ctr. Assocs. v. Portman Cos.*, 41
Cal. App. 4th 29, 40 (1995).

The complaint's allegations, taken as true, are insufficient to establish a claim for
interference with a contract or prospective economic relationship.  The complaint does not

allege facts explaining what current or expected future contracts plaintiff had with third party farms.  The complaint also fails to set forth facts showing that the farms have breached a contract or that plaintiff's relationship with the farms has been disrupted as a result of defendants' false statements.  The complaint lacks facts explaining the damages that plaintiff has suffered as a result of any breached contract or disrupted relationship.  These factual allegations are insufficient to meet the elements of intentional interference with contract or prospective economic relationship and the Court recommends denying default judgment as to those claims.

### 3.    Sum of Money at Stake

The fourth factor weighs neither for or against default judgment against the defendants.  Under this factor, "the Court must consider the amount of money at stake in relation to the seriousness of [d]efendant's conduct."  *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1050 (N.D. Cal. 2010) (internal quotation marks and citation omitted).  "If the sum of money at issue is reasonably proportionate to the harm caused by the defendant's actions, then default judgment is warranted."  *Walters v. Statewide Concrete Barrier, Inc.*, No. 04-cv-02559 JSW (MEJ), 2006 WL 2527776, at *4 (N.D. Cal. Aug. 30, 2006).  In determining if the amount at stake is reasonable, the Court may consider a plaintiff's declarations, calculations, pay stubs, and other documentation of damages.  *See Truong Giang Corp. v. Twinstar Tea Corp.*, No. 06-cv-03594 JSW, 2007 WL 1545173, at *12 (N.D. Cal. May 29, 2007).

Here, plaintiff seeks $320,809.97, which represents the principle of the loan that defendants have not repaid, plus interest as required by the promissory note.  Dkt. No. 41 at ¶ 25.  Plaintiff also seeks $500,000 in consequential damages, resulting from plaintiff having to cover for defendants' breach of contract and purchase green coffee on the open market at a price higher than agreed to in the contract.  Dkt. No. 64 at ¶¶ 25, 29.  Plaintiff also seeks costs and attorney's fees.  *Id.* at ¶ 40.  The Court finds that the amount at stake, although significant, is reasonably proportionate to the harm caused by defendant's breach.  *See Canadian Nat. Ry. Co. v. Phoenix Logistics, Inc.*, No. 11-cv-04589 EMC, 2012 WL

1376978, at *2 (N.D. Cal. Apr. 19, 2012) (finding default judgment warranted where

plaintiff's damages were "limited to the damages that would be reasonably expected to put

Plaintiff in the same position had Defendant fulfilled its contractual obligations.").

### 4.    Possibility of a Dispute of Material Fact

The fifth *Eitel* factor—possibility of a dispute concerning the material facts—also

weighs in favor of default judgment.  Because the defendants have not made an effort to

challenge the complaint, there is nothing to suggest that a dispute in the facts exists.  *See*

*Transamerica Life Ins. Co. v. Estate of Ward*, No. 11-cv-00433 JAM (EFB), 2011 WL

5241257, at *4 (E.D. Cal. Oct. 31, 2011) (finding that "there is a very low likelihood that

any genuine issue of material fact exists" because "the court [assumes] the truth of well-

pleaded facts in the complaint following the clerk's entry of default"); *see also W. Reserve*

*Life Assur. Co. of Ohio v. Canul*, No. 11-cv-01751 AWI (JLT), 2012 WL 844589, at *3

(E.D. Cal. Mar. 12, 2012) ("[T]here is little possibility of dispute concerning material facts

because (1) based on the entry of default, the Court accepts all allegations in Plaintiff's

Complaint as true and (2) Defendant has not made any effort to challenge the Complaint or

otherwise appear in this case.").  Therefore, this factor weighs in favor of entering default

judgment against the defendants.

### 5.    Excusable Neglect

The sixth *Eitel* factor—whether the default was due to excusable neglect—also

weighs in favor of default judgment.  Excusable neglect is an equitable concept and "takes

account of factors such as 'prejudice, the length of the delay and impact on judicial

proceedings, the reason for the delay, including whether it was within the reasonable control

of the [defendant], and whether the [defendant] acted in good faith.'"  *TCI Grp. Life Ins.*

*Plan v. Knoebber*, 244 F.3d 691, 696 (9th Cir. 2001) (quoting *Pioneer Inv. Servs. Co. v.*

*Brunswick Assocs. L.P.*, 507 U.S. 380, 395 (1993)).  Generally, courts will not find a

defendant's failure to participate excusable where the defendant has been properly served

and has notice of the entry of default and the motion for default judgment.  *Shanghai*

*Automation Instrument*, 194 F. Supp. 2d at 1005.

Here, the defendants were all properly served with the summons and complaint and, where required, the motion for default judgment. There is presently no evidence before the Court that would suggest that default was due to excusable neglect. Thus this factor weighs in favor of granting default judgment against the defendants.

### 6. Policy Favoring a Decision on the Merits

There is a strong policy favoring decisions on the merits that weighs against entering default judgment. *Eitel*, 782 F.2d at 1472. The existence of Federal Rule of Civil Procedure 55(b), however, shows that this policy is not dispositive. *Kloepping v. Fireman's Fund*, No. 94-cv-02684 TEH, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996). And a defendant's failure to appear makes a decision on the merits impracticable, if not impossible. *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1061 (N.D. Cal. 2010) (internal citation and quotation marks omitted). Given defendants' failure to respond to this action, a decision on the merits is impractical in this case. *Jennings*, 2011 WL 2609858, at *4.

In light of all the factors in favor of default judgment, this factor is not dispositive and the Court finds that, on balance, the *Eitel* factors weigh in favor of entering default judgment against defendants. *See Transamerica Life Ins.*, 2011 WL 5241257, at *4 (finding that the policy favoring decisions on the merits does not by itself preclude entry of default judgment).

### C. Damages

Plaintiff has the burden of "proving up" its damages. *See Bd. of Trs. of the Boilermaker Vacation Trust v. Skelly, Inc.*, No. 04-cv-02841 CW, 2005 WL 433462, at *2 (N.D. Cal. Feb. 24, 2005) ("Plaintiff has the burden of proving damages through testimony or written affidavit."). "It is well settled that a default judgment for money may not be entered without a hearing unless the amount claimed is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981).

Here, the Court finds that plaintiff, by providing the promissory notes and evidence of the amount repaid and amount yet to be paid, has sufficiently proven its actual damages

under the contract in the amount of $279,401.18 in principle plus $41,408.79 in interest, for a total of $320,809.97.  Dkt. Nos. 40-3 at 2; 41 at 5, 24, 29.  Although plaintiff has properly alleged claims for both breach of contract and common counts, it cannot recover the money owed twice.  Thus plaintiff is owed a total of $320,809.97.  The Court finds these damages capable of calculation without a hearing.

In addition, plaintiff has sufficiently supported its claim for attorney's fees.  The promissory notes state that "[i]f enforcement of this Note shall become necessary, the undersigned hereby agrees to pay all reasonable costs and expenses of collection hereof, including reasonable attorneys' fees."  Dkt. No. 41 at 24, 29.  To determine a reasonable attorney's fee, or "lodestar," the starting point is the number of hours reasonably expended multiplied by a reasonable hourly rate.  *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The Court, in considering what constitutes a reasonable hourly rate, looks to the prevailing market rate in the relevant community.  *Blum v. Stenson*, 465 U.S. 886, 895 (1984).

Here, plaintiff's attorney Paul Smoot submitted a sworn declaration accounting for 151.5 hours of time and $884 in costs spent on this litigation through the time of filing the motion for default judgment in October of 2013.  Dkt. No. 57-3 at 12.  The declaration accounts for Smoot's time in significant detail, and given the complexity of the claims and challenges with service, the Court finds the claimed time of 151.5 hours to be reasonable.  *Id.* at 5-13.  The Court will not award fees for time spent after October 2013, as much of the delay in the Court's ruling and the need for additional filings was caused by a simple pleading error in the original complaint.  As for the hourly rate, Smoot is a solo practitioner and attests that his hourly rate is $495 per hour.  *Id.* at 2.  Smoot has practiced law for more than twenty years.  *Id.*  The Court finds the hourly rate to be reasonable in this case and thus awards a total of $75,876.50 in attorney's fees and costs.

But plaintiff has failed to provide evidence proving he is entitled to consequential damages.  "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable."

1   *Ash v. N. Am. Title Co.*, 223 Cal. App. 4th 1258, 1268 (2014); Cal. Civ. Code § 3300

2   (limiting contract damages to those "which will compensate the party aggrieved for all the

3   detriment proximately caused thereby, or which, in the ordinary course of things, would be

4   likely to result therefrom."). This means that damages which are "secondary or derivative

5   losses arising from circumstances that are particular to the contract or to the parties" are

6   only recoverable "if the special or particular circumstances from which they arise were

7   actually communicated to or known by the breaching party (a subjective test) or were

8   matters of which the breaching party should have been aware at the time of contracting (an

9   objective test)." *Ash*, 223 Cal. App. 4th at 1270 (denying consequential damages where

10  court found "[t]here is no evidence in the record that [plaintiff] communicated to

11  [defendants] at the time of contracting" the special circumstances resulting in consequential

12  damages).

13          In his declaration, Pete Rogers attests that as a result of defendants' failure to provide

14  green coffee as contracted, he had a shortfall of 400,000 pounds of coffee and that "JBR's

15  price increased $5,643,427.31" for the coffee he was able to acquire. Dkt. No. 41 at 14,

16  ¶ 29. The complaint states that the parties discussed these "disastrous consequences of a

17  failure to repay in the event of increased market prices, reduced production and increased

18  demand." Dkt. No. 64 at ¶ 24. Plaintiff also alleged that defendants "had actual knowledge

19  . . . that Plaintiff JBR could and would suffer losses of approximately $1,000,000.00 USD in

20  the event defendants did not perform because, at least in part, Plaintiff would be forced to

21  obtain green coffee on the open market at spot prices, or, alternatively, be unable to fill pre-

22  existing or projected orders based upon the contracts with Don Paco." *Id.* at ¶ 25.

23          But plaintiff has provided no evidence outside the complaint supporting its allegation

24  that defendants had knowledge at the time of contracting that their breach would cause

25  plaintiff to suffer millions of dollars in damages as a result of higher coffee prices on the

26  open market. The declaration of Pete Rogers suggests that the opposite circumstances were

27  equally likely to occur: "Our long standing practice was to lock-in a above market price for

28  green coffee (paying a premium [over market] for the green coffee) ensuring a fair price and

Case No. 12-cv-02377 NC
R&R ON MOTION FOR                                  29
DEFAULT JUDGMENT

stability for the farmer and benefitting us by ensuring quality green coffee at a price certain." Dkt. No. 41 at 6:2-5.  Nor do the promissory notes themselves include language making the parties aware of special risks plaintiff faced in the event of a breach.  Dkt. No. 41 at 24, 29.  Despite attesting that it suffered over five million dollars in consequential damages as a result of defendants' breach, plaintiff only requests $500,000 in consequential damages.  Plaintiff offers no explanation for how it reached that figure, suggesting that the amount is arbitrary, rather than an amount that could have been foreseeable to a contracting party.  Therefore, the Court finds that plaintiff has failed to show that the consequential damages were foreseeable to defendants.

## IV. CONCLUSION

The Court issues this report and recommendation that the default judgment be granted as to plaintiff's breach of contract and common counts claims, that default judgment be denied as to plaintiff's intentional interference claim, and that damages be awarded in the amount of $320,809.97 plus $75,876.50 in attorney's fees and costs.

IT IS SO ORDERED.

Date: August 25, 2014

Nathanael M. Cousins
United States Magistrate Judge